May it please the Court, my name is Bruce Ferg, Assistant United States Attorney on behalf of the government. This case is kind of the opposite or the obverse of the case that you've heard in Beatty. This is a government appeal protesting the district court's suppression of certain evidence that came out of a wiretap which Counsel, let me bounce a couple of things off you that interested me in this record and maybe you can help on them. I was kind of struck that the government said in the affidavit that they couldn't, basically, they couldn't put surveillance cameras on poles near the company headquarters. And the evidence is they could have. And my first thought was, what does it matter? You can't see conversations. But then I thought, well, you could see known coyotes walking in and out of headquarters to pay bribes. Why isn't it important that the government said it couldn't when it could? Well, we would maintain that, in fact, they couldn't in the sense that apparently this was a rough neighborhood in which there was a lot of activity of various kinds, gang activity, and people were much more interested in what was going on. And so it was more difficult. They weren't painted over. They weren't clouded over. There were clear windows, were they not? And it was a residential as well as a commercial neighborhood. It was a mixed neighborhood. I have the same question. There was some kind of a covering that made it difficult to see in during the day. But, again, the basic point is, what are they going to see when we're talking about this kind of an operation? Coyotes going in and out. Except that the evidence was that that all took place out at the terminal level. There was no indication that even the terminal managers who legitimately might have had business coming to the headquarters often came there. Well, wait a minute. Well, I guess this backs up to another question I had. I was trying to figure out what crime the government would be trying to indict these people for, and I was thinking, if you run a bus company that goes between Mexico and the U.S. or between Canada and the U.S., places where you don't need a passport, you know for a fact that you must be transporting a certain proportion of illegal aliens trying to sneak in. It's got to be the case. It's just like if you're Alaska Airlines flying between Mexico and the United States. You know for a fact, partly because you see some police meeting the plane sometime, that you're bringing in dope dealers that are carrying dope. It has to be so. What's the crime exactly? Well, basically that it was intentional smuggling of aliens. If you're taking bribes to allow them in, then I could see it. Is that what you're looking for? That was part of it, that there were, in fact, ongoing relationships with the coyotes, the people who were bringing the aliens across the border. That's why I asked that question. I was thinking, how do you make a crime out of this? Actually, this goes to the whole reason why this wiretap was necessary, because what we're talking about is on its face a legitimate bus company. Let's take it then that what you're looking for is relationships with the coyotes. Is that about it? Well, not necessarily just with the coyotes, because there are prior wiretaps which have not been challenged on this appeal or that even the district court had any problem with, indicated that those kinds of contacts were primarily going on at the terminal level, El Paso, Phoenix, Tucson. And so the real issue was, as Bennett and a lot of the other wiretap cases talk about, is how far does this conspiracy reach? Who is really involved? What is he involved in? That raises another question I had reading the record. One of the arguments made in the affidavit for why you need a wiretap is that personal conversations that people who were cooperating had had with the Gonzaleses did not reveal any criminal activity. And I was thinking, well, does that really prove you need a warrant? Let's see. People come around in my chambers from time to time and chat with me. Sometimes I have lunch with them. If they were working undercover for the government, they would probably report back, conversation with Kleinfeld revealed no criminal activity. Well, that would probably be because there wasn't any to reveal. I don't happen to be smuggling any aliens just now or selling any dope or doing any of these things that would be of interest to the government. How do I know Gonzales also didn't reveal criminal activity in the conversations because he wasn't doing anything? The inference, the reasonable inference from the rest of the investigation was that when you have so pervasive a degree of activity, that it is likely that the people at the top are also involved. That gets back to my first question, of course. And so actually I think it was McGuire or it may have been one of the more recent cases which pointed out that one of the important things that a wiretap can do actually is to limit your field by excluding people who appear to be involved but may not be. And so it in a sense is a protection for the innocent as well as the most effective means of finding probative evidence of guilt. This is not like a dope smuggling operation where you're going to be able to look and see people loading bales of marijuana. Basically you're talking about the headquarters of a corporation and the question is are they really involved or is it simply rogue terminal managers who are doing this on their own? And it's possible that they are innocent. But exactly, running buses across the border that have illegal aliens on them? Not across the border, although apparently they did have some routes that go into Mexico. It's primarily a question of in Tucson specifically but also to some degree in Phoenix, the coyotes, those who were engaged in direct smuggling across the border, would bring huge groups, 10, 20, 30, 40 at a time by blocks of tickets and then ship them. Wait a minute, if I'm running a Greyhound bus and somebody buys tickets for 30 Mexicans to go from Phoenix to Boise, I don't see why as the bus driver or terminal operator I should even concern myself. Most likely they're just going to work in agricultural projects in Boise and whoever is the foreman of that group is buying them their tickets. I had an H-1B case where apparently there are only some Mexicans from some town in Mexico who have the skills to work some expensive sprinkler equipment in Idaho. And that's what I was thinking of. You'd bring a whole bunch of them up at once because these are the only people you trust with your expensive irrigation equipment. Well, again, as part of the ongoing operation, it was clear that many of these people were not being brought across with green cards or anything like that but were in fact being brought across by coyotes. They were being smuggled. They were clearly illegal. And this was on an ongoing regular basis. And that's why it was so important to determine, again, are these rogues? It's a typical kind of a RICO issue. Is the legitimate enterprise being used by a subversive element within it or is it the entire enterprise which is, in fact, illegal? And that's what they needed to find out. But if I may, I'd like to kind of redirect our discussion here a little bit. But may I interrupt? I'm sorry, and ask one question. Assume that we find, with respect only now to the Blake offices, the physical surveillance was insufficient, that you could have had video surveillance. Assuming that those were Frank's violations, what else do you have with respect to the Blake office? I'm not sure I understand. What else do I have as far as the base? Necessity for using a wiretap is a question here. And you said it was necessary because you'd done some physical surveillance, you couldn't do video, et cetera. What else do you have to show necessity? Well, the basic investigation had demonstrated or it was a strong appearance that there was illegal smuggling on a regular basis in all of these buses, that they were changing routes. The bus terminals. The one at the Blake office. The fact was that in the initial wiretaps to Phoenix and Tucson, there were some conversations with Antonio and Francisco Gonzalez, which on the face of them seemed to indicate that they were, in fact, aware that they were transporting illegals and, in fact, conniving to do it. How could they not be aware? I mean, if you're transporting people who speak Spanish in the southwestern United States, you have to think, well, there's a good chance there's some illegal aliens. Well, there's a difference between being an ordinary common carrier who has that happen and someone who's engaged in the business, and that's what the whole point of the wiretap was. What evidence was there that they were engaged in the business before you wiretapped them? That, for example, in coordination with the earlier wiretaps, the INS people actually made some specific stops of buses where there were 30, 40, 50 illegals on them, took them off, arrested the drivers, and so forth. And what they then found was that there was an interchange between the Phoenix and Tucson terminals and the two Gonzalez's at the Blake office, which indicated awareness of this, concern that INS was interfering with their business and actually changing of routes to avoid the INS. I don't understand what interchange and changing routes. Conversations. What do you mean interchange? You mean talk? Talk, I'm sorry, between the managers at the Phoenix. You mean the manager calls up the home office and says, geez, the INS agents keep busting our buses? Exactly. That seems like it's as likely legit as illegitimate, because if you're running a business and the government keeps busting your buses, people are going to hire your competitor. Well, either that or you go to the government and say, I know this ought not to be done, and I'll cooperate with you, but you don't start running different routes, specifically stating we will do this to avoid the INS stops, which is what some of the conversations reflected. What I'd like to suggest, though, is that really we're getting down a rabbit trail here, because although there were multiple errors committed in the way that the district court handled this, basically when it got into this whole franks and what was shown and what wasn't, it shouldn't have gone there at all. Its initial responsibility was simply to find necessity, to review the finding of necessity that the issuing judges had made within the four corners of the affidavits. That's what Shryock and Bennett and all the other cases say. It's only if there is an actual demonstration of the threshold requirements of franks that you look any further, that you look behind the affidavit and start getting into issues about what was said or wasn't said or not told. And what we have here is a case where the district court never made a finding, even after the hearing, that franks had ever been violated. I thought he did and was just being polite. I guess it's partly affected by having met the judge, but it's mostly just from reading what he wrote. It looks like he did indeed make the finding and he was just polite about it instead of just calling people a liar. Well, perhaps your experience is different, but generally district court judges that I know call a spade a spade. And if they are called upon to make a franks finding, they say, under franks, I find there was intentional or reckless misrepresentations or omissions. And then they go on to make a materiality finding, none of which is here. If you actually read the language of the suppression order, and it's in a couple of places, it's in the excerpt of record at 436, but it's also in my reply brief on page four. The entire reason that Judge Collins gave for the suppression was he says that he's looked at the Blake affidavit and he thinks that there are certain things that could have been done in addition as far as further investigation. It was clear from the record that the Blake offices were open and easily accessible. Undercover agents could have been sent into the Blake office more than the one time. And this is the way he ends. The court finds, therefore, that the government has not met the burden of proof of necessity for the Blake affidavit, and therefore it's suppressed. That is simply a reweighing of the necessity finding. In no way does that resemble franks. He doesn't say anything about the mental state, which is critical, whether it was intentional or at least reckless. Nothing is said there about there being a misrepresentation or an omission. He simply said there are other things you could have done. Well, that goes to necessity, and that's all that he talks about is necessity. Nothing about franks. Oh, I understood it. I would, at least as one member of the panel here, I would appreciate it if at some point you would address the standing issue. Okay. Because I thought that the Supreme Court's law was a little bit unclear as to whether the owner of a business would have standing to suppress calls to which they weren't a party. I know there's precedent the owner of a home would. There might be a commercial residential distinction. I at least wanted to hear from you on that as well as hear from the appellates. There is, indeed, that distinction which is drawn, and there are a number of cases, including Ortega v. Conner and some others that I cited in brief, which specifically say that, that there is a different or a lesser expectation of privacy in a commercial premises. But the main thing is the language in, I think, Salvucci, which says that basically some kind of a property interest, whatever that may be, is not a proxy for the Fourth Amendment interest. And so although the Gonzaleses, in a sense, were the owners, they had largely divested themselves of that right by leasing it and so forth, but the bottom line is there was no evidence, and again, no finding by the district court, that they had any Fourth Amendment interest in the conversations. We're talking about not conversations to which they themselves were parties or had directed. We have no qualms that those are things that they have standing to attack. But they really wanted to be able to object to every conversation made out of Blake by everybody in the building. I'm having trouble with that. The analogy that I'm thinking of is my law office when I was in the practice of law. I leased it. I didn't own the building. A leasehold is a property interest. It's just a traditional species of property. It's a non-freehold estate. It's a state for years. And if somebody had wiretapped my secretary's phone but not mine, then the government, if I were doing, say, federal criminal defense, the government could track all of my contacts with witnesses. They would know when I was getting warm, when I was cold, when I was on a rabbit track, and when I was really getting somewhere. And I sure would have an interest in the conversations that my secretary had, saying, do you think you'd mind coming in and talk to Mr. Kleinfeld or could he go over there and talk to you? Because she was making those ‑‑ she was engaging in those conversations at my direction. Exactly. And that's what would give you standing. But there was no evidence. And, again, the burden is on the defendants to prove that they have some interest in this. Well, if they own the business and they lease the property, it seems like you could presume that what's being done there on behalf of the business, the business conversations that take place from there, are at their direction or subject to their direction. Well, it's not ‑‑ my reading of the cases is that it's not read that broadly. For example, this court's Cella case, C-E-L-L-A, which follows also some Fifth and Tenth and Eleventh Circuit cases, talks about a business nexus. And they say the fact that even you as a total shareholder or a CEO or whatever may have access and control in a broad sense of a particular premises doesn't mean that you actually have a Fourth Amendment interest. For example, in Cella, it was the print shop of a hospital. And the hospital executive hardly ever went there. They said there wasn't enough of a direct connection for him to have an expectation of privacy in that. Same thing here. We have a headquarters of 25 or 30 different people, all their different offices, and we're talking about their individual conversations, presumably not at the specific direction of the Gonzaleses, if they can prove that, fine, but what people are doing in their own relationship. And I'd, again, like to point the court to the cases in the reply brief. There are certainly non-business conversations, like when the school calls your secretary and says your daughter is sick. Could you come pick her up at the school? The ones that the Gonzaleses care about are precisely the ones where they are business conversations made by people as the Gonzaleses' agents or servants. But absent some kind of direction, again, some of the cases don't indicate that they have that kind of interest because it's the person who is speaking. It is their privacy interest which theoretically is being impinged upon by the intercept. That's why I pointed the court to that old King case at the very end. I don't see that. I mean, to go on with the analogy, which I think is I can't see any reason it wouldn't be analogous, my secretary knows my travel schedule before I do, and she calls up and makes reservations for me anticipating what I'm likely to want once I think about it. It's not at my specific direction, but it certainly is on my behalf, and it involves some privacy for security reasons for me. I don't want all the bad guys to know what hotel I'm staying at. Well, perhaps if there was evidence of that kind of a relationship here, then we would not be objecting. Well, what's routine in business? I mean, any good secretary does that, and a lot of what goes on in business is people anticipating what the boss would want if he were paying attention to this particular branch of the business. Well, what's routine may not necessarily be what, again, it becomes a rather fact-intensive analysis. There's a different slant on this that I recognize, that a judge's relationship with a secretary is sort of a bilateral, you know, every day there are things they're doing, but it's not true like that in every business, and everyone on the business premises isn't acting at the behest of the owners of the business in all respects. So I'm concerned with where they're standing if the owners of the business haven't made a request for the particular conversation. I would suggest not, that, again, without some direct personal interest, that the Fourth Amendment is not involved. And, for example, Francisco Gonzalez, it's clear from the record, was in and out. He was often down at the terminals, and so even though in theory he had a right of control, most of the time he wasn't even there. And so why should he, for example, have standing about some conversation that somebody was doing, perhaps about the conspiracy, and we're clear from the Supreme Court that simply being a member of a conspiracy does not bestow standing. Why should he have an interest in the conversation of someone else, particularly, again, when no evidence was presented to the district court of that kind of direct involvement or direction? It was simply we own the place, we lease it, therefore we ought to have standing about everything that goes on. And although your time is up, I have a different perspective on this, too. I'm most interested in having you comment on the burden of proof here with respect to standing. And could you cite me to case authority? The burden is clearly on the defendant. I think Rakes itself talks about that. Let me see if I've got some of that. It was not handy. I didn't check it myself. But you commented on the burden of proof several times, and there was evidence in the record that Gonzalez was there at times. I did check in and out, and it goes to his expectations of privacy. I see the time is gone. I will check that myself. It's in the very beginning of the opening brief argument on standing. I know I put it in there. Thank you. Thank you, counsel. Good morning, Your Honor. May it please the Court, my name is Bill Kirshner. I represent Gustavo Arellano, who is one of the appellees in this case. And Mr. Picareta is here today. He represents Antonio Gonzalez, another of the appellees. Mr. Picareta was going to address the standing issue, and so I would like to save that issue for later in the argument. It's obviously of great interest to the panel. I hope you'll leave him some time. I see that, and I definitely will. But the issues that I intend to address today are the judge's suppression order itself. And contrary to what you've heard today, that suppression order was completely justified by the week-long evidentiary hearing that was held in this case. What we alleged and what we proved and what Judge Collins found in this case was that the agents had done virtually no investigation of significance at the Blake Avenue offices before applying for their wiretap. It was as if the government wanted to investigate General Motors, and they start out by investigating and infiltrating some automobile dealerships maybe out in Arizona. Spend a couple of years doing that and get wiretaps, and then all of a sudden they decide, well, wiretaps indicate maybe we want to hear something over at the headquarters of General Motors in Michigan. And instead of doing a new investigation at the General Motors headquarters in Michigan, which Title III requires, instead what they did is just go through and make their affidavit sound like they had done that kind of investigation. That's what they had done here. That's what Title III prohibits, and that's why Judge Collins' ruling was completely justified in this case. Now, the government's argument can be broken out into three separate parts. One is that a Franks hearing should not have been held in this case, and I don't intend to address that unless the Court has specific questions on that, because I think the record so clearly supports a Franks hearing in this case. Our pleadings specified exactly what statements we said were misleading. They were supported by almost 100 pages of affidavits, transcripts, photographs, and other documentary material that more than satisfy the offer of proof requirements of Franks v. Delaware. The other two issues, however, that the government raises are, number one, that there was no finding of Franks in this case. There was no finding of misleading or untrue statements. And secondly, that even if there was, that necessity still was shown in this case. And I think turning to the first of those issues, the government is correct that the judge's order does not say, I find the following misstatements. However, it is clearly implied in that order, as you mentioned, Judge Klinefeld, and there are a number of ways that we can see that. One is that Judge Collins found that there was virtually no investigation of the Blake Avenue offices. Obviously, that is very much at odds with what was portrayed in the affidavits. And so clearly he has found that there are untrue things in the affidavits. Otherwise, he couldn't have found that. Pardon me? Under Franks, can there be an implied finding? I mean, if the judge thought that they hadn't been forthright, doesn't the judge have to say that? I mean, judges are not like shrinking violets or, you know, I mean, this is a federal physical court judge. He's going to send people to prison or prison by his ruling. I don't really buy the idea that he can not say something if it's required to be courteous. The question is, is it required under Franks? It's the question in my mind. Is it required in Franks that the judge make a finding of intentional misrepresentation or reckless omission along with the relevance determination? I believe it is required under Franks that the judge make the finding, but whether he make it explicit in the record is something that's not necessarily required. Mr. Baird, what part of the order? I was looking at an order that is ruling in all these hearings. What lines of the order do you contend make an implicit finding? I don't have the actual order in front of me, so I can't show you exactly the lines, but the parts that I suggest. I'm sure you have the explicit record, just as we do. I haven't brought those along, but what I can tell you. The substance of what he actually said literally that you contend is sufficient under Franks. The parts that I'm talking about are, number one, the fact that he made as a factual finding that there had been virtually no investigation done here. That cannot be squared with the affidavit. You can't have reached that conclusion and still believe what was said in the affidavit. That's number one. Secondly, the fact that he reached the necessity issue at all implies that. It was very clearly briefed in this case in writing. It was briefed orally in this case. And as a matter of fact, the trial prosecutor in this case, in closing argument in these hearings, said as follows. To overturn these wiretap affidavits, either the first one, second one, or the third one, this Court has to tell Mr. Hill, the case agent, you're a liar. You lied to Judge Berry. You lied to Judge Marcus. Or you acted with reckless disregard for the truth. This judge knew what the standard was. And the fact that he reached the second issue, the necessity issue. Kennedy. Someone could make an argument like that because they're trying to make it seem like if the judge wants to suppress that he's got to go to that extreme. Right. But, I mean, couldn't there be a misunderstanding that's not a Franks-level misrepresentation? You can't rule out the possibility that there could be that understanding, but it's highly unlikely, given the nature and the extent of the briefing in this case, given the nature and extent of argument in this case, that the judge could have possibly missed that. As a matter of fact, during the argument before the hearing, Judge Collins did make a finding explicitly on the record in response to the prosecution's request that at least the initial pleadings had shown that there were misrepresentations, whether they be intentional or reckless or not. And for that, I do have a record site, and that is the excerpt of record at pages 507 through 508. The bottom of 507 through the top of 508, he specifically says, yes, I make the finding that there were misrepresentations. Now, I don't want to mislead the Court. That was certainly in regard to the initial showing. But my point is that it was very clearly argued to this judge. And I think that the tenor of the conversation that was held in this case was pretty much, Judge, you're going to have to throw this agent in front of the train and say that he's a liar. And this judge didn't respond to that well. He decided not to make a, you know, such an abrasive finding. He made a more subtle finding in this case. But I think it's clearly implied. What is the significance of this remark by the judge on page 511? I believe that the defense has raised some questions about certain things in the affidavit that had they told the judge those things, that it may have had an impact on whether or not the judge granted the wiretap. And then he goes on on the next page and says, because of those concerns I have about those things, had these judgments told these things, that's why I granted the Franks hearing. Had they known they could have walked down to the L.A. Times and answered an ad in the paper, they may have got somebody in the building. And it goes on like that. The significance of those is that this judge had read the pleadings, he knew what the standard was, and he was applying the standard in his decisions in this case. And Counsel, you cited, you sent a 28-J letter and cited the case of U.S. v. Lee, indicating that when the district court does not enter findings that factor conclusions of law on motion to suppress appellate court will uphold ruling if there is a reasonable view of the evidence that will sustain it. Are you depending on that case? I'm depending on that line of cases, which I think is still good law. You cited several other cases. I cited several other cases. Now, the government has made an argument in their brief, and it was in their reply brief, so I didn't have a chance to respond until just recently. But their argument was that Rule 12D requires the judge to make explicit findings of fact. And I don't disagree with that. That is what Rule 12D says. And they cited the Prieto-Villa case. But I think it's very important to note that those cases that I cited in my supplemental notice of authority, two of those cases post-date the Prieto-Villa case. So it is still good law in this circuit that this Court can affirm the trial court's ruling on a motion to suppress, even where the judge does not make explicit findings of fact. And it's a thing that this Court does all of the time. As a defense attorney, I can tell you I've been on the opposite end of this, and I know. I cited the Arizona v. Johnson case, which you may remember, Judge Nelson, I argued last year in this Court. And in that case, the judge had just made a ruling without saying what exactly facts he relied on or telling us what his legal ruling was. And this Court went through in that case and looked at what facts were implied in that case and what the judge's legal reasoning must have done, must have been, and affirmed on that basis. It's commonplace. It's well understood that this Court is going to affirm a correct ruling if it is made for no stated reason. And the Court will actually affirm a correct ruling even if it's made for a reason that is wrongly stated on the record. If the Court reaches the right conclusion, this Court will affirm. But I think it's very important for me to say right here that if for any reason this Court doesn't believe this record abundantly supports affirming this decision, which we believe it does, but the remedy would not be, I respectfully submit, what the government requests. What the government requests is for you to reverse the suppression order. That is not the remedy that would follow that fact or that finding. The remedy, the correct remedy would be to simply remand this case to the trial court for further findings of fact. That is what was done in the Prieto Villa case that the government cites, and that was what was done in the cases that have followed Prieto Villa. But that's, it's not necessary to take the time and the judicial resources that would be required to do that here. In this case, the record amply supports this judge's finding of fact. He sat through a week-long evidentiary hearing. He listened to the witnesses. He was able to evaluate their demeanor. And the conclusion that he came to was fully supported. I think the best example of that is the question of whether they could have had a confidential informant talk with the top people in the Golden State organization. If you look at their wiretap affidavits, they make it sound, they say our confidential informants have little or no contact with the top people in this organization. But what they didn't tell the issuing judge was that eight months earlier, they decided to send an informant in. This informant was able to just waltz right in, talk with Mr. Gonzalez, the vice president and founder of the company. Is that evidence in the record? Yes. Is that what the judge is talking about here at 518, where he says, I didn't say anything about whether the government lied? The issue is whether or not they were false or reckless or misleading statements. Reckless is a different thing than being false. Is he saying they were reckless not to talk about this informant there? Is that a finding of recklessness? Well, I believe that the... I'm not sure of the context. And I'm not entirely sure because I haven't looked at which transcript this is from, but I believe from the page numbering... I always figure the lawyers are going to know the record better than I do. Well, and I believe from the page numbering that this transcript is from the pre-trial arguments, or the pre-hearing arguments, and therefore it's not a post-hearing finding of fact on the record, if that's what your question is. Yes. However, it is an initial finding of fact, and it shows that this judge knew what the standard was. The one thing that I noticed, and maybe I'm missing something, but is that page 436, I guess, of the... Page 4 of his order on the motion, and he's got one paragraph talking about the Blake affidavit. And so is that it? Is that all he said after the motion? I mean, he does say it's not necessary. He doesn't really say very much. There's not... There's no analysis there. No extensive analysis. No discussion necessarily of all the Ninth Circuit's precedents or most recent precedents on necessity. The same is true of his standing order. He's got a one-liner that says I've decided that the Gonzaleses have standing. We'll get to that later, but he doesn't add any analysis there. And I'm not going to stand here and tell you that it says anything different than what it actually says there. This is the total of what he said here. I would point out that the government in this case did not move for any reconsideration. The government did not argue. Under Rule 12, we'd like findings of fact. So, yes, this is what was said, but I think that's very clear, that the judge would not have reached this point had he not initially made the finding that there were false statements or material omissions in these affidavits. And he could not have reached this logically, because this contradicts what was said in the affidavits. So it's very clear from that. And I think, you know, if you look at the example, I was just talking about the informant who came in, was able to walk into the hallway, talk with Mr. Gonzales. He was able to tape him. He was able to talk with him about smuggling undocumented immigrants. He did it not once, but twice in the same day. And Agent Hill admitted under cross-examination he knew about this, he admitted that it was important, and he had no way of explaining that. And so you can see that not only is it implied here, but the record fully supports it. And that's why this Court should affirm that ruling, even though the factual findings are not explicitly made on the record. I'm certainly going to. And if I could just summarize, I think it's important to say to this Court that Judge Collins' factual finding in this case was that there was virtually no investigation of significance done at the Blake Avenue headquarters. That is something that's reviewed for clear error by this Court. And under – if you take the facts that were found by Judge Collins, and if you had submitted those facts to the issuing magistrate, there's no question that the issuing magistrate would not have issued this wiretap warrant in this case. And that's the reason that we ask you to affirm his ruling. Thank you. Thank you, counsel. Thank you for the opportunity. I'm happy to address the standing issue. In this case, the Alderman case, which is cited in our memos, indicates that an individual has standing to suppress conversations in which he was a participant or conversations that occurred on his premises. So we're looking at, is the Blake Avenue, the suite of offices in Los Angeles, Antonio and Francisco Gonzalez's premises? Well, what do we know? And there was an affidavit submitted. And throughout the hearing, it was – it was – there's evidence in the record indicates, A, Antonio and Francisco Gonzalez owned the building, B, that it was leased to Golden State Transportation, of which Tony Gonzalez is the chief executive officer, and Francisco Gonzalez does more of the operations. The evidence was that Tony Gonzalez is there on a daily basis and runs his business in this 2,000-square-foot building. Isn't there also, though, an issue whether the case you cited was the Alderman? Yes. That that involves the premises of a home, doesn't it? Well, Alderman was a home, but it was discussing electronic surveillance. But the next step, which is when you look at the Mancusi case, which is where they gave standing to the union official in the union hall. It was a search. It wasn't electronic surveillance, but the rules are the same. So in Mancusi, they said, you have standing for this common area in the union hall, Mr. Union Official. Then the other cases that we have found, and I acknowledge that there's not a lot of them, was the Lefkowitz case, where there was a suite of offices, similar to what Judge Kleinfeld was talking about, where they gave standing for the corporate suite, which is what we have here, except in a freestanding building, for the corporate officers. And finally, there was the case Leary, which was from the Tenth Circuit, where they indicated they gave standing to corporate officers in those circumstances. But here, though, What did he say about Leary? Leary was the Tenth Circuit case where a corporate officer can assert a reasonable expectation of privacy in his corporate office. And the sites are in the brief. But here we have more than that. They own the building. Tony Gonzalez runs the company. Of the corporation, he signed the lease on behalf of the corporation.  And everything, in terms of business-wise, is done on behalf of the CFO. He was the target of their wiretap. And so the information they're trying to gather is from Tony Gonzalez and Francisco Gonzalez. When you ask, if you ask anybody, is it his premises, yes, the corporation was leasing it, but not by excluding Tony and Francisco Gonzalez from the premises. So this is their daily spot. And on top of the company, they're on the board, not only of the CEO, he's on the board of directors, owns 35 percent of the stock, runs the daily operation, owns the building, runs the office, has access to the entire building. So it's really hard to fathom a fact-bound situation such as this where any corporate officer would have less control over the premises. The case, as the government cites, is I'm the owner and I lease it to somebody and I'm never there, and so I don't have control over the premises. Here we do. If they were going to ask for consent to search, who would they go to but to Tony or Francisco Gonzalez? So they have dominion, control, ownership, operator, managerial experience, stock ownership, board of directors, and running in this business. So in terms of expectations of privacy, it's hard to fathom anyone. The only argument the government has is, well, it's a corporation, and that is their argument, that since it's a corporation, only they have standing. And that's not what the cases that have analyzed this, Lefkowitz or Leary or other ones that discuss about businesses say. If the calls were intercepted on his premises, then he has standing. And I think here the ownership might settle it in terms of the findings of fact, what that was apparent, what I've just told you, throughout the record in terms of when they were developing it. But secondarily, after the ruling, affidavits were submitted without objection by the government in terms of the contents, which indicate the information again in a very succinct manner as to what I've just told you. Thank you. Thank you, counsel. The government exhausted its time, but if you wish to take one minute for rebuttal, we'll give you one minute. I'll get this in as quickly as I can. The standard of proof or the burden of proof is on page 51. It is on the defendant. As far as the implicit findings, no, there cannot be implicit Frank's findings. If you look at the 28-J letter, there is not a single Frank's case in any one of those. Johnson was not a Frank's case. It was simply a mid-trial ruling about an evidentiary objection, not a pretrial suppression issue such as Rule 12 addresses. The judge wasn't finding recklessness in that part that I quoted? He was speculating. See, the problem was that he was talking beforehand, and I'm not sure at that point he really did understand the standard because he constantly talks about I have concerns, there are questions raised. But Frank's doesn't say questions and concerns are enough. It says you must make a threshold finding, a substantial finding, that there was recklessness or intentionality and materiality. And he doesn't do any of those either before or after. That paragraph that I pointed to at 400-something, is that the only thing he said after the motion? That's all. That and the surrounding three or four pages are the total extent of the order, and you'll notice that it's even internally inconsistent because previous to that, on the previous page, he says that the government had done everything that was necessary in order to substantiate or to show necessity for the first two wiretaps. And that includes the fact that Mr. Hernandez had already had his abortive trip, in which he learned absolutely nothing, into the Blake office building. Yeah, he could walk up and talk to Don Pancho, but could he get anything meaningful out of him? No. The point is not just access to have face time, but access to obtain meaningful evidence. That's what the reasonability rule is all about. You only have to conduct an investigation to the point where it becomes clear that the ordinary means aren't getting you anywhere. And that's what happened here. Oh yeah, I can go up and he'll give me a high five and say hello, but will he talk about significant issues related to the running of the business with me, a bus driver? No, he won't. But he did. He didn't. He talked to him about whatever the bus driver wanted to talk about. Mr. Hernandez attempted to raise the whole issue of, well, I'm real concerned about these illegal aliens being on our buses, and you've sent out this memo that we may be responsible if we don't search the bus, which was in fact diligence by the INS in seizing on this opportunity to at least try and get him in there. And basically, if you read the transcripts which are included, I can't give you the citation, but the transcript is included in there. And basically he's saying, well, don't you worry about it. You as a driver have nothing to say about it. And nothing at all that goes to his degree of knowledge that this is illegal or anything else. What it shows really is that that kind of encounter is not going to get them anywhere. There are other situations, and I cited a couple places in the brief, where there are other people who had attempted to approach him at the terminals when he was out there and had conversations. No, no, he kind of brushes them off. So the only way you're going to get an insight into what is really going on, whether these people are really conspiring, is to hear what they are saying to one another. And the wiretap is the only way to do that. Thank you, counsel. United States v. Gonzales is submitted.
judges: D.W. Nelson, Kleinfeld, Gould